## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| O'DRISCOLL CONSTRUCTORS, INC., <br><br> Plaintiff, <br><br> NICHOLAS BAKER, <br><br> Intervenor Plaintiff, <br><br> v. <br><br> EMCASCO INSURANCE COMPANY, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00699-JNP-DAO <br><br> District Judge Jill N. Parrish |

Before the court are three motions: (1) a Motion for Summary Judgment on Insurance Coverage filed by Intervenor Plaintiff Nicholas Baker ("Mr. Baker") (ECF No. 57); (2) a Motion for Summary Judgment filed by Plaintiff O'Driscoll Constructors, Inc. ("O'Driscoll Constructors")[1] (ECF No. 58); and (3) a Motion for Summary Judgment filed by Defendant EMCASCO Insurance Company ("EMC") (ECF No. 61). The court entertained oral argument on the motions on August 30, 2021. Having carefully reviewed the parties' memoranda and the relevant law and considered the oral arguments raised, the court denies Mr. Baker's motion, grants in part O'Driscoll Constructors' motion, and denies EMC's motion.

---

[1] O'Driscoll Constructors also filed a Notice of Joinder to Intervenor Plaintiff Nicholas Baker's Motion and Memorandum for Summary Judgment on Insurance Coverage (ECF No. 59), in which O'Driscoll Constructors "adopt[ed] as its own and incorporate[d] by reference the arguments and legal authority set forth by Intervenor Plaintiff Nicholas Baker in its motion subsequently filed herein." *Id.* at 1.

## BACKGROUND

Justin O'Driscoll ("Mr. O'Driscoll") is the president and sole owner of O'Driscoll Constructors. O'Driscoll Constructors previously obtained commercial auto insurance coverage through American Hallmark Insurance ("AHI"). On March 11, 2014, Mr. O'Driscoll emailed Kathy Jewell ("Ms. Jewell"), an account manager for InfiniTeam, which is a retail insurance broker. In the email, Mr. O'Driscoll stated that they had been unable to insure Miguel Diaz ("Mr. Diaz"), an O'Driscoll Constructors employee, the prior year and inquired whether there was "any way we can check again to see if he is ok." ECF No. 61-6 at 2. Mr. O'Driscoll subsequently emailed Ms. Jewell a list of drivers generated by InfiniTeam. Mr. Diaz's name was listed with "EXCLUDED" next to his name. ECF No. 61-7 at 3. Mr. O'Driscoll understood this to mean that Mr. Diaz could not be included on the AHI policy as a driver because of his poor driving record. Mr. O'Driscoll's understanding was based on representations by Ryan Gardner, a licensed insurance producer in Utah who is employed by InfiniTeam and has acted as a licensed producer for both AHI and EMC. Although Mr. Diaz was not actually without coverage under the AHI policies, Mr. Gardner testified that he had represented to Mr. O'Driscoll that Mr. Diaz had no coverage. Ms. Jewell testified that the word "excluded" was for "InfiniTeam's use only" to indicate that a driver was a "bad driver." ECF No. 57-6 at 8.

O'Driscoll Constructors applied for a 2015–2016 insurance policy from EMC. InfiniTeam sent EMC the application. Mr. Diaz was listed as "EXCLUDED" on the driver information schedule included in the application. ECF No. 61-8 at 12. The business quotes provided to O'Driscoll Constructors included automobile liability coverage for bodily injury of $1,000,000 for O'Driscoll Constructors and its drivers. The quotes did not include any endorsements setting lower limits as to any particular driver. In March of 2015, EMC issued a commercial auto insurance

policy to O'Driscoll Constructors (Policy No. 5E2-68-12-16). The policy period ran from March 18, 2015 to March 18, 2016, and the policy provided a liability limit of $1,000,000 per occurrence and did not include any endorsements setting lower limits as to any driver. EMC also issued O'Driscoll Constructors an umbrella coverage policy (the "Umbrella Policy") (Policy No. 5J2-68-12-16) for the same policy period.

On March 13, 2015, Gina Sainz ("Ms. Sainz"), an EMC employee, emailed Ms. Jewell, indicating that EMC had received the motor vehicle records for some of O'Driscoll Constructors' drivers and would not be able to include certain drivers on the approved drivers list because of their violations. Mr. Diaz was one of the listed drivers. Ms. Sainz informed Ms. Jewell that EMC would be "endorsing the policy, effective 03/20/15, to add Minimum Limits of Insurance While a Certain Person is Operating Auto – Utah" for the listed drivers. ECF No. 61-10 at 2.

On or about May 12, 2015, EMC sent Minimum Limits of Insurance Endorsement forms to InfiniTeam to obtain the requisite signatures. On June 11, 2015, Ms. Jewell emailed Mr. O'Driscoll and attached Minimum Limits of Insurance Endorsement forms for signature. In her email, Ms. Jewell explained that Mr. Diaz and another driver, "due to their driving records have the same endorsement limiting coverage to the state minimum liability added." *Id.* at 2. Ms. Jewell further explained that the forms needed to be signed by Mr. O'Driscoll and the listed drivers—one of which was Mr. Diaz—and advised that "[r]ight now state minimum is 25K per person, bodily injury, 65K per accident and 15K per accident for property damage liability." *Id.* Ms. Jewell concluded her email by writing, "Sorry this is not good news." *Id.*

The first page of the email attachment was titled "CHANGE ENDORSEMENT" and stated, "ENDORSEMENT EFFECTIVE DATES: 03/20/15 TO 03/18/16" and "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." ECF No. 61-

15 at 4. The following pages contained the endorsement forms. The forms again stated, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY," and were titled "MINIMUM LIMITS OF INSURANCE WHILE A CERTAIN PERSON IS OPERATING AUTO – UTAH." *Id.* at 6, 5, 15. The Minimum Limits of Insurance Endorsement form on which Mr. Diaz's name was typewritten stated the following:

> With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.
> In consideration of the premium payment, it is agreed that all coverage is not in effect except to the extent necessary to provide minimum limits of liability as required by Utah Code Ann. §41-12a-101 and §31A-22-304, caused while the "auto" described in the policy, or any other "auto" to which the terms of the policy are extended, is being driven or operated by the following named person:
>
> MIGUEL DIAZ
> (Driver Name)

ECF Nos. 61-15 at 6. The form also had "INFINITEAM INSURANCE INC" typewritten above "(Agent Name)," and "5E26812-16" typewritten next to "Policy Number." *Id.* One of the attached forms contained identical language but left "(Driver Name)," "(Agent Name)," and "Policy Number" blank. *Id.* at 15.

Mr. O'Driscoll did not reply to Ms. Jewell's June 11, 2015 email. On July 21, 2015, Bobbie Boatwright ("Ms. Boatwright"), a new account manager at InfiniTeam who was hired to service Mr. Gardner's accounts, sent a follow-up email to Mr. O'Driscoll. Ms. Boatwright's email included Ms. Jewell's June 11, 2015 email in the email chain and stated the following: "Hi Justin, Following up on the request below. Please forward the signed forms to my attention at your earliest convenience." ECF No. 61-16 at 2. On August 4, 2015, Mr. O'Driscoll sent a blank email to Ms. Jewell with signed Minimum Limits of Insurance Endorsement forms for Mr. Diaz and another

4

driver attached. For Mr. Diaz's Minimum Limits of Insurance Endorsement form (CA7202.8) (the "Endorsement"), Mr. O'Driscoll used the non-designated, or blank form. Mr. Diaz's name was handwritten above "(Driver Name)." ECF No. 61-17 at 3. Mr. Diaz signed the form above "(Driver Signature)," and Justin O'Driscoll signed above "(Witness or Agent Signature)." *Id.* Four areas on the Endorsement were left blank: "(Agent Name)," "(Named Insured, Company Representative Signature)," "Date Signed," and "Policy Number." *Id.* Ms. Jewell forwarded the signed Minimum Limits of Insurance Endorsement forms to Ms. Boatwright, who in turn emailed Mr. O'Driscoll and thanked him for sending the signed forms.

On August 5, 2015, Ms. Boatwright emailed Mr. Diaz's Endorsement form to Dan Eagle, an underwriter at EMC. The form reflected Ryan Gardner's name handwritten above "(Agent Name)" and "(Named Insured, Company Representative Signature)." ECF No. 61-20 at 4. An InfiniTeam employee—most likely Ms. Boatwright, or Ms. Jewell—signed the Endorsement form on Mr. Gardner's behalf using Mr. Gardner's name. Ms. Jewell testified that it is not typically InfiniTeam's practice to sign documents on behalf of Mr. Gardner. The form was dated "8-4-15," and the policy number "5E26812" was written in as well. ECF No. 61-20 at 4. This version of the Endorsement was never sent to O'Driscoll Constructors.

On or about October 15, 2015, Mr. Baker was involved in an accident with Mr. Diaz. Mr. Diaz was driving a vehicle owned by O'Driscoll Constructors and insured under a commercial auto policy issued by EMC. EMC assigned Karl Goeken ("Mr. Goeken") to be the claims adjuster for the accident. On October 15, 2015, Mr. Goeken recorded the following in his claim notes:

> *Discuss BI coverage Yes
>
> $1 million csl. Justin said his driver may either be excluded as a driver or may have an endorsement which only extends minimum legal limi[ts] for when he is driving, we will need to verify.

ECF No. 61-23 at 3. Mr. Goeken informed O'Driscoll Constructors in a letter dated October 15, 2015 that the available limit for Mr. Baker's claim was $25,000.

Mr. Baker sustained injuries from the accident and sued O'Driscoll Constructors and Mr. Diaz for negligence. Based upon the foregoing, O'Driscoll Constructors sued EMC for breach of contract and breach of the implied covenant of good faith and fair dealing. EMC timely removed the case to federal court based on diversity jurisdiction. Pursuant to a stipulation of the parties, Mr. Baker intervened as a plaintiff in this matter. In an amended complaint, O'Driscoll Constructors added a third cause of action against EMC for breach of fiduciary duty. Mr. Baker also filed a complaint, seeking a declaratory judgment. Now before the court are cross-motions for summary judgment filed by the parties under Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

"Interpretation of an insurance contract presents a question of law." *Viking Ins. Co. of Wis. v. Coleman*, 927 P.2d 661, 663 (Utah Ct. App. 1996). "Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999). "When the existence of a contract and the identity of its parties are not in issue and when the contract provisions are clear and complete, the meaning of the contract can appropriately be resolved by the court on summary judgment." *Basic Rsch., LLC v. Admiral Ins. Co.*, 297 P.3d 578, 579 (Utah 2013) (citation omitted).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted).

## ANALYSIS

Mr. Baker moves for summary judgment on the issue of insurance coverage and seeks a declaratory judgment that EMC "provided 'bodily injury' liability coverage" to O'Driscoll Constructors and Mr. Diaz "of no less than $1,000,000" for the injuries that Mr. Baker suffered because of the October 2015 accident. ECF No. 57 at 5. Mr. Baker asserts four bases for the declaratory judgment he seeks: (1) under the Utah Insurance Code (the "Insurance Code"), the documents delivered to O'Driscoll Constructors, and the Certified Policy, the $1,000,000 liability limit provided in O'Driscoll Constructors' policy with EMC was not reduced to $25,000; (2) under Utah common law, the Endorsement for Mr. Diaz fails to amend the policy; (3) the Endorsement does not reduce the limits of the policy because it does not properly incorporate a policy limit by reference under the Insurance Code and is ambiguous, and EMC used policy language rejected by the Utah Insurance Commissioner; and (4) EMC provided umbrella coverage of $1,000,000 to O'Driscoll Constructors and Mr. Diaz, and the umbrella coverage is applicable here. Mr. Baker also seeks an award of attorney's fees and costs.

7

O'Driscoll Constructors also moves for summary judgment and joins Mr. Baker's motion, adopting and incorporating by reference the arguments and legal authority set forth therein.[2] O'Driscoll Constructors also separately requests an award of attorney's fees and costs.

Finally, EMC moves for summary judgment. EMC argues that it is entitled to summary judgment on the breach of contract claim because EMC "correctly capped coverage at $25,000" pursuant to the valid and enforceable Endorsement. ECF No. 61 at 19. And, because it did not breach the contract and complied with its implied obligations, EMC argues that it is entitled to summary judgment on the bad faith and breach of fiduciary duty claims.

The court considers the parties' arguments below.

## I.     Breach of Contract Claim

"An insurance policy is merely a contract between the insured and the insurer . . . ." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). Thus, the court "interpret[s] insurance policies as [it] do[es] contracts: 'if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language.'" *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1213 (Utah 2006) (citation omitted). Utah courts also consider title 31A of the Utah Code, which "sets out a comprehensive regulatory framework for the insurance industry." *See Allen v. Prudential Prop. & Cas. Ins. Co.*, 839 P.2d 798, 804–05 (Utah 1992); *Moore v. Energy Mut. Ins. Co.*, 814 P.2d 1141, 1144 (Utah Ct. App.

---

[2] In joining Mr. Baker's motion for summary judgment, O'Driscoll Constructors appears to seek declaratory relief. However, O'Driscoll Constructors does not assert a claim for declaratory relief in its Amended Complaint, which only contains claims for breaches of contract, the implied covenant of good faith and fair dealing, and fiduciary duty. ECF No. 25. Unless O'Driscoll Constructors amends its complaint to seek declaratory relief, the court cannot grant such relief for O'Driscoll Constructors.

1991) (observing that "Utah's common law position is also in harmony with Utah statutory provisions governing the insurance industry").

To succeed on a breach of contract claim, a plaintiff must establish "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001), *abrogated on other grounds as recognized by A.S. v. R.S.*, 416 P.3d 465 (Utah 2017). EMC argues that O'Driscoll Constructors cannot establish the third element above. Although O'Driscoll Constructors and Mr. Baker assert that EMC breached its duties under the policy by only extending $25,000 of coverage to O'Driscoll Constructors in Mr. Baker's lawsuit, as opposed to the policy limit of $1,000,000, EMC argues that it was not in breach, as it was only required to extend $25,000 of coverage pursuant to the Endorsement.

The Insurance Code states that "[a] purported modification of a contract during the term of the policy may not affect the obligations of a party to the contract . . . unless the modification is: (i) in writing; and (ii) agreed to by the party against whose interest the modification operates." UTAH CODE § 31A-21-106(2)(a). Here, EMC argues that the Endorsement meets the modification requirements. Consequently, EMC contends that it did not breach its duties under the contract by extending only $25,000 of coverage to O'Driscoll Constructors in Mr. Baker's lawsuit. The court disagrees. The Endorsement was in writing, thereby satisfying the first modification requirement prescribed by the Insurance Code. But the Endorsement suffers two fatal flaws: (1) it is not agreed to by both of the parties against whose interest it operates; and (2) even if both of the parties against whose interests the Endorsement operates had agreed to its terms, the modification is unsupported by consideration. The court discusses each issue in turn.

9

A.     Agreed to by Parties Against Whose Interest Endorsement Operated

EMC argues that the Endorsement is valid and enforceable because it is agreed to by the

parties against whose interest it operates, as evinced by Mr. Diaz and Mr. O'Driscoll signing the

Endorsement and Mr. O'Driscoll sending the signed Endorsement back to Ms. Jewell, who in turn

forwarded the Endorsement to EMC. The court disagrees with both of EMC's theories of assent.

1)     Assent by Signature

A "written policy evinces a 'meeting of the minds' between the insurer and the insured."

*U.S. Fid. & Guarantee Co. v. U.S. Sports Specialty Ass'n*, 270 P.3d 464, 470 (Utah 2012) (citation

omitted). "The writing outlines the material terms and obligations that may be enforced under the

policy, and it defines the risk relationship the parties have established." *Id.* (footnotes omitted).

Agreement or assent to a contract can be manifested by signing the contract. *See Bergdorf v.*

*Salmon Elec. Contractors Inc.*, 447 P.3d 1265, 1273 (Utah Ct. App.), *cert. denied*, 456 P.3d 389

(Utah 2019); *see also John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1208 (Utah 1987)

("[A] party is bound by the contract which he or she voluntarily and knowingly signs.").

Mr. Diaz signed the Endorsement as the "Driver" and thereby agreed to its terms. The other

party against whose interest the Endorsement operated—and therefore whose signature was

required—was O'Driscoll Constructors, the insured.[3] EMC argues that Mr. O'Driscoll signed the

Endorsement "on behalf of O'Driscoll [Constructors]." ECF No. 61 at 22. But the Endorsement

that Mr. O'Driscoll sent back to Ms. Jewell does not support this contention. Although it is

undisputed that Mr. O'Driscoll signed the Endorsement, the analysis does not stop at such a

---

[3] The policy plainly identifies "O'Driscoll Constructors Inc." as the "named insured." ECF No. 57-14 at 4.

superficial juncture. A closer examination of the Endorsement reveals that Mr. O'Driscoll signed above "(Witness or Agent Signature)."[4] ECF No. 57-18 at 2. The line designated for "(Named Insured, Company Representative Signature)" was conspicuously left blank, unsigned.

Utah courts have long recognized the distinction between signing a contract in one's personal, individual capacity and signing a contract in one's representative, corporate capacity. *See, e.g.*, *Marveon Sign Co. v. Roennebeck*, 694 P.2d 604, 604 (Utah 1984) (distinguishing between signing a contract in one's personal capacity and in an agent or representative capacity); *Anderson v. Gardner*, 647 P.2d 3, 5 (Utah 1982) (same); *Mortgage Inv. Co. v. Toone*, 406 P.2d 30, 31 (Utah 1965) (holding that an individual who personally signed a contract "without indicating that he was an agent acting for a principal" signed in his "individual capacity"). This distinction is especially important in the context of corporations like O'Driscoll Constructors. "Corporations can only act through agents, be they officers or employees." *Davis v. Payne & Day, Inc.*, 348 P.2d 337, 339 (Utah 1960). However, "[t]he general rule is that a corporation is an entity separate and distinct from its officers, shareholders and directors and that they will not be held personally liable for the corporation's debts and obligations." *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998) (citation omitted).

There is no evidence that Mr. O'Driscoll signed the Endorsement in his capacity as the president of O'Driscoll Constructors, rather than in his individual, personal capacity. Nothing on the face of the Endorsement indicates that Mr. O'Driscoll signed it on behalf of O'Driscoll Constructors. Mr. O'Driscoll signed his name on the Endorsement above the "(Witness or Agent

---

[4] "Agent" appears to be in reference to the same "Agent" who is identified as having explained the Endorsement form to the undersigned. ECF No. 57-18 at 2.

Signature)" line, plainly indicating that he was signing in his individual capacity and merely as a witness to Mr. Diaz's signature. He did not sign above the "(Named Insured, Company Representative Signature)" line. Nor did Mr. O'Driscoll write his title after his signature. Mr. O'Driscoll testified in his deposition that although his signature is found on the Endorsement above the witness line, he has no recollection of signing it or ever discussing it. ECF No. 57-20 at 23–25. No one from InfiniTeam or EMC witnessed Mr. O'Driscoll sign the Endorsement. Indeed, the only person that signed above the "(Named Insured, Company Representative Signature)" line was someone from InfiniTeam—likely Ms. Boatwright—signing on behalf of Mr. Gardner. But there is no evidence that Ms. Boatwright or Mr. Gardner had authority to sign the Endorsement on behalf of O'Driscoll Constructors.[5] The Endorsement thus indicates that Mr. O'Driscoll signed it in his individual capacity as a witness to Mr. Diaz's signature, not in his official capacity on behalf of O'Driscoll Constructors.

In asserting that O'Driscoll Constructors agreed to and is bound by the Endorsement because Mr. O'Driscoll witnessed Mr. Diaz's signature, EMC seeks to execute a kind of reverse piercing of the corporate veil to bind O'Driscoll Constructors by Mr. O'Driscoll's conduct in his individual capacity. But EMC provides no authority supporting this maneuver. EMC argues that

---

[5] It is undisputed that EMC never sent the ostensibly fully-executed Endorsement—which contained signatures on Mr. Gardner's behalf, a date, and the relevant policy number—to O'Driscoll Constructors, even though such is required under the Insurance Code. *See* UTAH CODE §§ 31A-1-301(57) (defining "endorsement" as "a written agreement attached to a policy"); 31A-1-301(142)(a) (defining "policy" as "a document, including an attached endorsement"); 31A-21-106(1)(a) (stating that "an insurance policy may not contain any agreement or incorporate any provision not fully set forth in the policy or in an application or other document attached to and made a part of the policy at the time of its delivery, unless the policy, application, or agreement accurately reflects the terms of the incorporated agreement, provision, or attached document").

"a signature on an incorrect line will not invalidate an agreement" (ECF No. 61 at 24) and cites *Karapanos v. Boardwalk Fries, Inc.*, 837 P.2d 576 (Utah Ct. App. 1992) as supporting authority. In *Karapanos*, the Utah Court of Appeals disagreed with a franchisee's contention that because he signed an agreement "in the wrong place, the agreement was never executed." *Id.* at 577. The court noted the "general rule that a signature located anywhere on a contract is sufficient to authenticate the instrument if it was placed there with the intent to do so." *Id.* (citation omitted). But *Karapanos* is distinguishable. The franchisee in *Karapanos* had two places to sign on a franchise agreement:

> The first appeared after the language, "IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written." The second appeared after the language, "I, Peter C. Karapanos hereby agree to be personally liable to Franchisor for performance of all obligations of Franchisee under the above Agreement."

*Id.* The franchisee "signed the agreement on the second line, but failed to sign on the first line"; that is, he "had signed on the line indicating he was personally liable for all of the obligations of the franchisee, but had not signed on the line for the franchisee." *Id.* Here, Mr. O'Driscoll signed on the "(Witness or Agent Signature)" line but did not sign on the "(Named Insured, Company Representative Signature)" line. These are not parallel circumstances.

By signing the agreement, the franchisee in *Karapanos* evidently agreed to be bound by its terms, even though he failed to sign on an additional line. Here, Mr. O'Driscoll's signature as a "Witness or Agent" does not manifest his assent to be bound by the Endorsement; it manifests his witnessing of Mr. Diaz's signature. Witnessing another's assent cannot be conflated with providing one's own assent. Mr. Diaz's and Mr. O'Driscoll's signatures are preceded in the Endorsement by the following language: "[p]rovided, you accept this endorsement as witnessed by your signature," "[p]rovided further, that, unless this endorsement is revoked in writing by us, this endorsement

shall be a part of this policy, or any continuation, renewal, replacement, or reinstatement of this policy issued by us," "I understand [the above]," and "I further understand this constitutes a waiver of coverage." ECF No. 57-18 at 2. Mr. Diaz accepted the endorsement—he signed above "(Driver Signature)." But Mr. O'Driscoll only signed as a witness, not as an insured or representative of O'Driscoll Constructors. Mr. O'Driscoll's witnessing signature authenticates that he witnessed Mr. Diaz sign and agree to the Endorsement, not that O'Driscoll Constructors signed and agreed to the Endorsement as well.

In short, contrary to EMC's position, there is no evidence that Mr. O'Driscoll signed the Endorsement on behalf of O'Driscoll Constructors, as its president. Rather, the face of the Endorsement plainly indicates that Mr. O'Driscoll was signing in his personal, individual capacity as a witness to Mr. Diaz's signature.

2)      Assent by Email

The only other evidence that EMC cites in support of its contention that O'Driscoll Constructors agreed to the Endorsement is that Mr. O'Driscoll emailed the signed Endorsement back to Ms. Jewell. But the Endorsement that was sent to Ms. Jewell was still agreed to only by Mr. Diaz, witnessed by Mr. O'Driscoll, and void of any signature from the named insured or company representative. EMC provides no authority to support that a party's blank email with an attached document that does not itself evince the party's agreement can manifest agreement. The court does not find that such is the case here.

In the absence of agreement by both of the parties against whose interest the Endorsement operated, the Endorsement fails under the Insurance Code's modification requirements and does not manifest the assent of the parties involved. The Endorsement is therefore unenforceable.

14

B.     Consideration

Even if Mr. O'Driscoll was acting in his capacity as the president of O'Driscoll Constructors when he signed the Endorsement and was thereby agreeing to the Endorsement on behalf of O'Driscoll Constructors, the Endorsement is still unenforceable for lack of consideration. It is a well-established principle of contract law that "consideration is necessary to sustain a contract modifying an existing contract." *Nordfors v. Knight*, 60 P.2d 1115, 1118 (Utah 1936); *see also Prye v. Kalbaugh*, 97 P. 331, 334 (Utah 1908) (stating that a party "relying upon a modification of the contract" must prove "a new or an additional consideration"); *Combined Metals v. Bastian*, 267 P. 1020, 1031 (Utah 1928) ("The authorities are substantially of one accord that when the original contract no longer is executory . . . the subsequent agreement, to be binding and effective requires a new or independent consideration . . . ."); *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 91 (Utah 1988) ("If there is lack of consideration, there is no contract.").[6] "Consideration is commonly defined as '[s]omething of value (such as an act, a

---

[6] The Utah Supreme Court has noted that "[w]here a modified agreement has been fully executed it will not be disturbed for a want of consideration." *Nordfors*, 60 P.2d at 1118 (citation omitted). Here, as the court held above, *see supra* Section I(A), the Endorsement was not "fully executed" because it was not agreed to and signed by O'Driscoll Constructors. Indeed, the Endorsement form that Mr. O'Driscoll sent back to InfiniTeam was not only missing O'Driscoll Constructors' signature, it was also missing the policy number, date, and name of the Agent who explained its terms to Mr. O'Driscoll and Mr. Diaz. EMC never followed up with O'Driscoll Constructors regarding these deficiencies, and the erroneously completed Endorsement that InfiniTeam sent to EMC was also never delivered to O'Driscoll Constructors. Thus, there is good reason to "disturb[]" the Endorsement here.

The Utah Supreme Court has also stated that "[i]f the original contract is still executory on both sides either in whole or in part, and the parties in forming a new contract waive or release any liability created by the original contract, such waiver is a consideration for the promise of the party whose liability is thus released." *Prye*, 97 P. at 334. Here, the original contract—the underlying policy—was not still executory at the time of the Endorsement modification. The policy became effective on March 18, 2015, and was delivered to O'Driscoll Constructors on March 24, 2015.

forbearance, or a return promise) received by a promisor from a promisee.'" *Sur. Underwriters v. E & C Trucking, Inc.*, 10 P.3d 338, 342 n.6 (Utah 2000) (citation omitted).

Here, there was no consideration to support the modification of the policy through the Endorsement. O'Driscoll Constructors paid a premium of $39,856 for a policy that provided automobile liability coverage for bodily injury of $1,000,000 for O'Driscoll Constructors and all of its drivers. ECF No. 57-14 at 4. The policy did not include any endorsements setting lower limits as to any driver. And yet EMC now purports to enforce an Endorsement that lowered the coverage for Mr. Diaz from $1,000,000 to $25,000 at no reduction in premium cost to O'Driscoll Constructors.

When pressed to demonstrate consideration for the Endorsement at oral argument, counsel for EMC's only argument was that EMC did not cancel the policy or take any legal action to do so. But this argument fails on the face of the policy. The policy contains an endorsement titled "UTAH CHANGES – CANCELLATION AND NONRENEWAL" that expressly provides as follows:

> **7.** If this policy has been in effect for more than 60 days or if this is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:
>
> **a.** Nonpayment of premium;
> **b.** Material misrepresentation;
> **c.** Substantial change in the risk assumed unless we should reasonably have foreseen the change or contemplated the risk when entering the contract; or
> **d.** Substantial breaches of contractual duties, conditions or warranties.

---

The Endorsement was not sent to Mr. O'Driscoll until June 11, 2015 and was not signed by Mr. Diaz and Mr. O'Driscoll until August 4, 2015.

> If we cancel for nonpayment of premium, notice of cancellation must state the reason for cancellation.

**8.** With respect to the Commercial Automobile Coverage Part, the following applies in addition to the provisions of Paragraph **7.** above:

> We may cancel this policy if your driver's license, or the driver's license of a person who customarily drives a "covered auto", is suspended or revoked.

ECF No. 57-14 at 23.

Here, the policy was in effect for more than sixty days when the Endorsement was initially sent to Mr. O'Driscoll on June 11, 2015 and when the Endorsement was sent back to InfiniTeam with signatures on August 4, 2015. As a result, EMC's ability to cancel the policy was limited to the bases specified in paragraph 7. None of the reasons specified in paragraph 7 are applicable here. There is no evidence the O'Driscoll Constructors did not pay its premium. There is no evidence that O'Driscoll Constructors made a material misrepresentation to EMC. There is no evidence that there was a substantial change in the risk assumed. And even if the discovery of Mr. Diaz's poor driving record could constitute such a change, EMC should have reasonably foreseen that change or contemplated that risk when entering into the policy.[7] Mr. Diaz's driving record should have been examined before EMC provided a policy to O'Driscoll Constructors insuring Mr. Diaz as a driver. Finally, there is no evidence of any substantial breaches of contractual duties, conditions, or warranties. Paragraph 8 of the endorsement also supplies no basis for cancellation, as there is no evidence that Mr. Diaz's driver's license was suspended or revoked. Thus, EMC's proffered consideration—its forbearance from cancelling the policy or taking any legal action to

---

[7] O'Driscoll Constructors' insurance policy application that InfiniTeam sent to EMC listed Mr. Diaz as "EXCLUDED" on the driver information schedule. ECF No. 61-8 at 12. This should have put EMC on notice of the risk.

do so—is no consideration at all when EMC was powerless to cancel the policy on this basis pursuant to the policy's very terms. The Endorsement is therefore unenforceable for lack of consideration supporting its modification of the policy.

Because the Endorsement is unenforceable, the court finds that EMC breached the terms of the insurance policy in extending only $25,000 of coverage to O'Driscoll Constructors in Mr. Baker's lawsuit instead of $1,000,000 of coverage as provided by the policy. The court therefore enters partial summary judgment in favor of O'Driscoll Constructors with respect to the element of breach. Because none of the parties have offered any evidence on the element of damages, which may not be ascertained until the resolution of the underlying state court action filed by Mr. Baker, the court reserves ruling on the damages issue until further briefing by the parties. Because the Endorsement is unenforceable for lack of agreement by O'Driscoll Constructors and lack of consideration, the court need not and does not reach the parties' other arguments regarding the validity and enforceability of the Endorsement or the applicability of the Umbrella Policy.

## II.     Breach of Implied Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty Claims

Because the court finds that EMC breached the terms of the insurance policy in only extending $25,000 of coverage to O'Driscoll Constructors for the automobile accident involving Mr. Diaz and Mr. Baker, the court defers consideration of O'Driscoll Constructors' claims of breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty. The court does so until it may assess whether damages for such claims are coextensive with the damages for the breach of contract claim.

III.     **Mr. Baker's Claim for Declaratory Judgment**

Mr. Baker moves for summary judgment on the issue of insurance coverage and seeks a declaratory judgment regarding EMC's obligations under its insurance policy with O'Driscoll Constructors. But it does not appear that Mr. Baker, as an injured third party who is neither a party nor an intended third party beneficiary of the insurance policy at issue, is a proper party to bring a direct action against EMC to declare the legal effects of the policy. Mr. Baker maintains that he has authority to bring such an action based on EMC's stipulation to his intervention in this case, EMC's recognition that he is bound by the court's rulings in this action, and provisions of Utah law, UTAH CODE §§ 31A-22-201, 78B-6-403(1), which permit him to "pursue a contract recovery under the policy once a judgment in the underlying case is obtained or the parties enter into a settlement." ECF No. 76 at 35. But Mr. Baker supplies no authority to suggest that he is an appropriate party to pursue his declaratory judgment action against EMC. The provisions of Utah law he cites plainly do not apply absent a judgment or settlement in the underlying case.

Mr. Baker asserts that he is a third party beneficiary of the policy, citing *Peterson v. Western Casualty & Surety Co.*, 425 P.2d 769, 771 (Utah 1967),[8] in which the Utah Supreme Court stated that "[a]s a member of the public injured by the insured, plaintiff became a third-party beneficiary of the policy." But the injured third party in *Peterson* was bringing suit against the insurer to compel the payment of a judgment that the injured third party had obtained against the insured. *Id.*

_____

[8] Mr. Baker also cites *M. H. Walker Realty Co. v. American Surety Co. of New York*, 211 P. 998, 1004 (Utah 1922), which states the general proposition that "whenever it appears from a contract that there is a clear intent to benefit a third party, whether specifically named in the contract or not, such person, ordinarily, may sue in his own name for the enforcement thereof or for the benefits arising therefrom." But Mr. Baker does not analyze this case or explain why it supports his position.

at 770. The injured third party in *Peterson* was the proper party to do so because "[t]he policy contained the usual provision that a judgment creditor of the insured may bring such a suit." *Id.* Thus, "the injured party [in *Peterson*] was granted standing to sue the insurer by virtue of a provision in the policy itself, not by operation of law." *Adams v. Gen. Accident Assurance Co. of Can.*, 133 F.3d 932, at *5 (10th Cir. 1997) (unpublished table decision) (citing *Peterson*, 425 P.2d at 770). Here, Mr. Baker has not obtained a judgment against O'Driscoll Constructors in the underlying lawsuit. Thus, *Peterson* is inapposite.

Mr. Baker maintains that he "has standing to pursue a declaratory judgment regarding coverage." ECF No. 76 at 35. But Utah law does not support his position. *See Utah Farm Bureau Ins. Co. v. Chugg*, 315 P.2d 277, 281 (Utah 1957) ("[O]ne who claims to be damaged by the [tortious] act of another[] is [not] a proper party to an action by the insurer of the [tortfeasor] under a public liability policy, whereby a declaratory judgment is sought declaring the legal effects of the terms of such policy."); *Campbell v. Stagg*, 596 P.2d 1037, 1039 (Utah 1979) (holding that an injured party has no direct cause of action in contract against a tortfeasor's insurer because the insurer's liability to the injured party "arises only secondarily, through its contractual arrangement with the [tortfeasor]"); *Davis County v. Jensen*, 83 P.3d 405, 408 (Utah Ct. App. 2003) (noting that "Utah adheres to the 'general rule, [that] in the absence of a contractual provision or a statute or ordinance to the contrary, . . . the absence of privity of contract between the [injured party] and the [tortfeasor's] insurer bars a direct action by the [injured party] against the [insurer]' in automobile insurance cases" (citation omitted)); *see also Broadwater v. Old Republic Sur.*, 854 P.2d 527, 537 (Utah 1993) ("A third party who benefits only incidentally from the performance of a contract has no right to recover under that contract."); *Adams*, 133 F.3d at *5 ("[W]e are convinced that Utah law does not grant injured parties . . . standing to directly sue an insurer.").

20

In sum, because Mr. Baker is not the proper party to bring a declaratory judgment action against EMC to determine policy coverage, his motion for summary judgment is denied.

## IV.   Requests for Attorney's Fees and Costs

In his motion for summary judgment, Mr. Baker also requests attorney's fees and costs. But because Mr. Baker is not the proper party to bring a declaratory judgment action against EMC, he is not entitled to attorney's fees and costs for pursuing the same. Accordingly, Mr. Baker's request for attorney's fees and costs is denied.

O'Driscoll Constructors also seeks attorney's fees and costs, arguing that it "has incurred significant and unnecessary costs" as a result of EMC's "unsubstantiated refusal to provide insurance coverage in the amount of $1,000,000.00 per the general liability policy issued to [O'Driscoll Constructors]." ECF No. 58 at 3. EMC argues that attorney's fees and costs are not warranted because it has not acted in bad faith or fraudulently, nor has it been stubbornly litigious. EMC argues that it "is entitled to defend its position and have this Court determine its duties and obligations under the Policy and the Umbrella Policy." ECF No. 71 at 43.

O'Driscoll Constructors is not entitled to attorney's fees or costs here. O'Driscoll Constructors cites only *American States Insurance Co. v. Walker*, 486 P.2d 1042 (Utah 1971) to support its requests for attorney's fees and costs. In *Walker*, the Utah Supreme Court stated that "[b]efore an award of attorney's fee could be made in [a] declaratory judgment action, it must appear that the insurance company acted in bad fa[i]th or fraudulently or was stubbornly litigious." *Id.* at 1044. The court does not find any bad faith, fraudulent activity, or stubborn litigiousness here. The Utah Supreme Court has recognized that "[a]n award of attorney fees is not warranted 'where the [insurer] merely stated its position and initiated this action for determination of what appears to be a justiciable controversy.'" *Farmers Ins. Exch. v. Call*, 712 P.2d 231, 237–38 (Utah

21

1985) (citation omitted). Here, EMC did not even initiate this action; EMC is only defending the terms of its insurance policy against actions brought by Mr. Baker and O'Driscoll Constructors. In so doing, EMC has properly raised for the court's consideration arguments regarding the enforceability of the Endorsement at issue. These arguments raise a justiciable controversy, and the court finds no basis for concluding that EMC has acted in bad faith, fraudulently, or in a stubbornly litigious manner. Accordingly, the court finds that O'Driscoll Constructors is not entitled to attorney's fees or costs.

## CONCLUSION AND ORDER

For the foregoing reasons, the court HEREBY ORDERS as follows:

1. Mr. Baker's Motion for Summary Judgment on Insurance Coverage (ECF No. 57) is DENIED because Mr. Baker is not the proper party to bring a declaratory judgment action against EMC.

2. O'Driscoll Constructors' Motion for Summary Judgment (ECF No. 58) is GRANTED IN PART on the issue of EMC's liability for breaching the terms of the insurance policy. The court reserves ruling on the issue of damages and on O'Driscoll's claims for breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty pending further briefing on the damages issue. O'Driscoll Constructors' attempt to join in Mr. Baker's motion for declaratory judgment is denied inasmuch as O'Driscoll Constructors' complaint contains no claim for declaratory judgment.

3. EMC's Motion for Summary Judgment (ECF No. 61) is DENIED.

4. Mr. Baker and O'Driscoll Constructors' requests for attorney's fees and costs are DENIED.

DATED September 2, 2021.

BY THE COURT

Jill N. Parrish
United States District Court Judge